NOT DESIGNATED FOR PUBLICATION

No. 118,638

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

IN THE MATTER OF N.B.

MEMORANDUM OPINION

Appeal from Meade District Court; E. LEIGH HOOD, judge. Opinion filed August 3, 2018. Reversed.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellant.

*Clay A. Kuhns*, of Kuhns Law Office LLC, of Ashland, for appellee.

Before LEBEN, P.J., STANDRIDGE, J., and RYAN W. ROSAUER, District Judge, assigned.

ROSAUER, J.: Natural Father of N.B., a minor child, appeals the district court's granting of Stepfather's Petition to Adopt N.B. without Father's consent. In the two years preceding the filing of Stepfather's Petition, N.B. was only 4 and 5 years old. The nature of the proceedings and respective decisions of the district court and this court require a detailed discussion of the testimony at trial.

FACTUAL AND PROCEDURAL HISTORY

Natural Father (Father) and Mother divorced in Wichita, Kansas, in December 2014 after approximately three years of marriage. There was one child of the marriage, N.B., born in 2011. In April 2014, while the divorce was pending, Mother moved to Meade, Kansas. After the divorce, Father lived in Fort Riley, Kansas; Wichita, Kansas;

1

and Louisiana at various times. At the time of the trial, he was living in Kansas. Mother married Stepfather in May 2017. One month later, in June, Stepfather petitioned the district court to adopt N.B. without Father's consent. Mother filed a concurrent consent to adopt. Father contested the adoption. In addition, after the filing of the Petition for Adoption, Father filed in Sedgwick County a motion to modify his parenting time, and the Sedgwick County District Court issued a modified parenting plan. Mother and Father were operating under that plan when the Meade County District Court held an evidentiary hearing on Stepfather's Petition to Adopt (Petition) on September 21, 2017. Both parents appeared with Father pro se and Stepfather represented by counsel. Only Stepfather called witnesses. No one contested the parentage of Father.

*Testimony of Mother*

Mother was Stepfather's first witness. She testified about the various dates relevant to the proceedings as noted in the previous paragraph. She said Father moved at various times after her April 2014 move to Meade, and he did not provide her with all the addresses he lived at. She said that in the two years preceding the filing of the Petition, there had been one instance of physical contact between N.B. and Father. Mother alleged that contact happened at a festival in Wichita, lasted about fifteen minutes, and that she could smell alcohol on Father's breath. During that two-year period, Mother said there were "two or three" times where Father had a video teleconference with N.B., even though the parenting plan allowed for video teleconferencing twice per week. Father also called once or twice a month during this two-year period to talk to N.B., and on some of those occasions Mother said she denied contact because he had called after 8 p.m. The calls were typically about a minute long, usually because N.B. wanted to get off the phone. Mother also claimed that Father did not send N.B. any cards or presents during that time. During the two-year period, on four occasions Father asked for school progress reports regarding N.B.; however, Mother did not provide any progress reports because he was on the school's contact list. Mother and Stepfather provided all the day-to-day care of

2

N.B. Father never attended any school or extracurricular functions for N.B. Mother admitted she denied parenting time for Father two or three times claiming that it was late or that he had been drinking.

Mother also testified about eight instances of parenting time the Sedgwick County parenting plan had given Father since the filing of the Petition. Mother testified that Father had exercised six of his allowed parenting times and missed the other two. During the first of the six parenting times, Mother said N.B. and Father went shooting, and she came back hungry because she had not eaten all day. Mother testified Father simply missed the second opportunity to have N.B. for parenting time. Mother said that while the third period of parenting time was uneventful, N.B. told Mother that Father dropped N.B. off at his mother's house to see his girlfriend. Mother offered no other testimony regarding the other four instances of Father's parenting time.

Over Father's objection, the district court admitted a letter from a therapist. That therapist, who was not a witness, recommended Stepfather be allowed to adopt N.B. According to Mother, the therapist believed that Stepfather adopting N.B. would be in her best interest. Later, the trial court said it gave the letter very little weight.

Regarding child support, Mother admitted that "for the most part" Father was current on child support. She did not offer testimony in terms of what "part" he was not current. There was no further evidence from either side regarding any alleged child support deficiency, past or present.

Mother also testified about Stepfather. She offered information about the length and extent of their marriage. Summarized, she testified Stepfather was a positive and loving influence on N.B. with whom he had a very positive relationship. Mother said N.B. believed her last name was Stepfather's last name. Mother believed Stepfather had been N.B.'s father during the previous two years, if not legally, then in effect.

3

During cross, Mother admitted Father had called the police several times to check on their daughter. Mother also admitted she had not provided documentation to Father about appointments with therapists and medical providers. She agreed that Father had been providing the medical insurance for N.B. She also testified that Father had been asking her about modifying the parenting plan because of scheduling issues. Mother admitted there had been times that Father called about N.B., but she had not responded.

*Testimony of Maternal Grandmother*

Maternal Grandmother testified she was the holder of the P.O. box to which Father was to direct correspondence to Mother regarding N.B. She said that in the two years preceding the filing of the Petition, Father had sent no cards, letters, gifts, or anything to N.B. On cross, Grandmother said Father had never directly contacted her to make contact with N.B.

*Testimony of Stepfather*

Stepfather testified he has been present when Father had called to talk to N.B. He also said that "more times than not" Mother would deny contact with N.B. because Father would call well past N.B.'s bedtime. When there was contact, the calls with N.B. would last "maybe a minute or two." He confirmed that Father had sent no cards, letters, or gifts to N.B. during the two years prior to the filing of the Petition. He was also unaware of Father exercising parenting time during the two years prior to the filing with the exception of the incident at the Wichita festival. He also agreed the total time of video and phone call contact during the two years before the filing was an hour.

Stepfather testified he believed it was in N.B.'s best interest for him to adopt her. He said he had been her father figure the previous three years. He provided the day-to-

day care for N.B. with Mother. He also said he provided financially for N.B. N.B. was, if not in name, then in spirit, his daughter at that moment. He testified he had been her father since N.B. was three, and she referred to him as "dad." Stepfather testified that during therapy, N.B. called him dad and Father by his first name.

*Testimony of Father*

Stepfather called Father as his last witness. Father confirmed that during the original parenting plan, he had parenting time from Wednesday at 6 p.m. to Sunday at 3 p.m. He also said the plan gave him two FaceTime and Skype opportunities during the week. Father testified he tried to exercise parenting time during the two-year period preceding the filing of the Petition, but Mother denied him parenting time. He also testified he was able to see N.B. on two occasions in addition to the Wichita festival. Father could not remember if those two other occasions were during the two-year period immediately before the Petition or before. He admitted he moved to Louisiana for a time, but also testified he had come back to Kansas every month. Since the filing of the Petition, he admitted he had not shown up to one of the visitations with N.B. and that he missed one other time because Mother did not show up. Father testified he had in fact sent cards to N.B., but he did not know why they did not get to N.B. Regarding gifts, he admitted he did not send gifts. Instead, he said he sent money to Mother to buy her gifts. Summarized, he testified the reason he had such limited contact with N.B. was because Mother was denying him the contact and was, in general, failing to keep him informed about what was happening in N.B.'s life.

Father's testimony concluded Mother's presentation of evidence. Father did not provide any additional evidence.

*District Court Findings*

The district court issued both oral and written findings. The following is a summary of the facts the court found salient in both its oral and written findings when it granted Stepfather's Petition:

(1)   Stepfather was financially stable and a steady employee;

(2)   during the two years prior to the filing of the Petition, Father had one instance of in-person contact with N.B., and that the contact was "incidental;"

(3)   during those two years, there were two or three instances of Skype or FaceTime and "maybe 30 minutes total" of phone call contact combined with the Skype and FaceTime;

(4)   even taking into account the age of the child where a young child would not talk a long time over the phone, the total contact was "pretty minimal;"

(5)   during the two consecutive years preceding the filing of the Petition, Father made "little or no effort" to contact N.B.;

(6)   Father sent no cards, gifts, or letters to N.B., a fact which the district court noted in both its written and oral findings "weighed heavily" against him;

(7)   Father did not make an independent effort to find out what school N.B. was going to or otherwise stay current on the events of N.B.'s life;

(8)   Father chose not to exercise the parenting time the original permanent parenting plan gave him and made no effort to enforce that parenting time;

(9)   he missed one of the parenting times after Stepfather filed the Petition and that the second missed time was because he had failed to text Mother at 8 a.m. on the day of the visitation per the modified parenting plan from Sedgwick County;

(10)  on one of the occasions he did exercise his parenting time after the Petition's filing, he did not feed N.B.;

(11)  in general, during the two years preceding the Petition's filing, Father "failed or refused to assume the duties of a parent;"

6

(12) Stepfather was "in all respects a proper and able person to adopt" N.B.; and

(13) it was in N.B.'s best interest to grant the Petition.

But the trial court also found the following facts:

(1)  Aside from the telephonic contact Father had with the child, Father made other attempts to call the child that Mother properly refused because of the late hour;

(2)  Father made no "independent," (separate from contacting Mother) attempt to find out where N.B. was going to school, which based on the evidence implied that Father had been contacting Mother to get this information but Mother was not providing it;

(3)  Father had not made efforts to enforce the divorce's original parenting plan, which would suggest that Mother had indeed been interfering with Father's attempts (else, there would have been no need to "enforce");

(4)  Father had been paying child support and was current in the payment of that support;

(5)  Father had been ensuring medical coverage for N.B.

Finally, there were matters about which the court heard evidence but made no ruling about whether the evidence was credible or not credible or otherwise relevant to its findings:

(1)  Father had sent money to Mother so that Mother could purchase gifts for N.B.;

(2)  generally, whether Mother had been interfering with Father's visitation with N.B. during the two years preceding the filing of the Petition;

(3)  more specifically, in accordance with Mother's testimony, whether Father had tried to exercise parenting time on two or three particular occasions with N.B. during the two years before the Petition, which Mother testified she refused to do because she believed he had been drinking or because it was late;

(4)  the extent to which Mother was refusing to communicate with Father about N.B., as demonstrated by her testimony regarding her unwillingness to

7

personally share information about N.B. with him, such as schooling, therapy and medical care information; and whether or not that refusal affected Father's ability to be involved in N.B.'s life; and

(5)  efforts Father made to check on the welfare of N.B. through the local police.

Neither party presented evidence that Father had been abusive, in any manner, to either N.B. or Mother during or after their marriage. Neither party presented evidence Father attempted to evade child support or medical coverage for N.B. There was no evidence Father was ever late in his child support payments. The record does not reflect Father even sought reduction in child support obligations at any time.

Ultimately, the district court found Father's consent was not necessary to approve Stepfather's Petition for Adoption "because of his lack of being a parent for two consecutive years preceding the filing of this Petition." Father timely appealed the district court.

## ANALYSIS

The standard of review is whether substantial competent evidence supports the trial court's determination that Stepfather could adopt N.B. without Father's consent. See *In re Application to Adopt J.M.D.*, 293 Kan. 153, 170-71, 260 P.3d 1196 (2011). The appellate court does not reweigh the evidence or pass on the credibility of witnesses. 293 Kan. at 171. Rather, the appellate court reviews the facts of the case in the light most favorable to the prevailing party, in this case the Stepfather, to ascertain whether substantial competent evidence exists. 293 Kan. at 171. "In other words, appellate review of factual questions should accord a great deal of deference to the trial judge's determination, even in those instances where the appellate jurists might have decided the case differently." 293 Kan. at 171.

8

Before delving into a determination of whether there was substantial competent evidence in the light most favorable to Stepfather, let us quickly review the statutory basis for a stepfather adoption without consent of the natural father at the time of the Petition's filing and trial. K.S.A. 2017 Supp. 59-2136(d) ordinarily requires a father's consent to a stepfather adoption. However, this same provision provided that consent of the father was not necessary if the father had "failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the petition for adoption or is incapable of giving such consent." K.S.A. 2017 Supp. 59-2136(d). When making a determination about whether a father has failed or refused to assume parental duties, the court can disregard incidental visitations, contacts, communications, or contributions. The court can consider the best interests of the child and the fitness of the father.

One additional matter, the court alternately allowed and did not allow the parties to offer testimony about events that occurred after the Petition's filing. Even though the court at times limited the parties to events that occurred prior to the Petition, the court sought testimony and made findings regarding events occurring after the Petition, specifically events concerning Father executing parenting time, Father's allegation that Mother interfered with one of those occasions, Mother's allegation that Father skipped parenting time, and Father not feeding the minor child during the first occasion he had her. Because there was not substantial and compelling evidence supporting the court's decision from the two years before the Petition's filing, this court need not delve into the appropriateness of the court's consideration of matters after the Petition's filing.

The evidence at trial does not provide substantial and compelling evidence supporting a finding that Father "failed or refused to assume the duties of a parent" for the two years immediately preceding the June 2017 filing of the adoption petition. The court found one instance of incidental physical contact in Wichita during the two previous years, but there was testimony of two other instances of physical contact where Father testified he exercised parental visitation. The evidence was unclear whether that

9

contact occurred during or just before the two-year period, but the trial court never made a finding about that issue. Neither did the trial court consider Mother's uncontradicted testimony that Father had attempted two or three other attempts at visitation, attempts which Mother rebuffed, even if properly so. As the trial court found, Father did have two years' worth of Skype/Facetime and telephone calls to the child. While the court noted the total time was "maybe 30 minutes total", the evidence clearly showed this contact was continuous through the period even if each individual contact was short. The trial court noted at N.B.'s age, the nature of such contact would be relatively short. Indeed, Mother testified the calls ended because N.B. wanted to get off the phone, not because Father wanted to end the calls. Father's continuous telephonic contact over two years, even if the individual contact is of a short duration, is not incidental.

The court said it weighed heavily against Father that he had not sent cards, letters, or gifts, but it made no findings regarding Father's testimony that he had in fact sent money to Mother so she could purchase gifts and he had sent cards to Maternal Grandmother's P.O. box. Neither did the trial court make a finding regarding Father's testimony that Mother repeatedly interfered with his attempts at telephonic contact during the two years previous to the Petition's filings other than to note that Mother would properly refuse late evening contact with N.B. Even Stepfather, in testimony from his own attorney, said that "more times than not" Mother denied telephonic contact because of the late hour. The court did seem to acknowledge in its findings the possibility Mother interfered with parenting time because the court did find that Father's failing to move the court to enforce the parenting plan was a basis for finding Father had failed to assume parental duties. The court found that Father did not independently call N.B.'s school, but the court never made a finding about whether he was contacting Mother to get information about N.B.'s school and medical care. Indeed, all the evidence, in particular Mother's testimony, suggests Father was attempting to get this information from Mother, and Mother was ignoring the attempts. In general, the trial court made no finding about

10

whether attempted, but unsuccessful, efforts to be involved in N.B.'s life showed an abandonment or refusal to perform parental duties.

The trial court found Father was current in child support. No party presented evidence that at any time during the two years preceding the Petition he ever fell out of compliance with child support orders. Furthermore, Father continued to carry N.B. as a dependent for medical insurance purposes, and neither party presented evidence there was ever an issue with medical coverage for N.B. Even though the trial court found Father was current on support, it put little weight into that support. However, no party presented evidence that Father ever tried to frustrate the payment of support or provisions for medical coverage. There was not even any evidence that Father tried to lower his support requirements from what the decree originally ordered. It seems the trial court put little stock in the support payments and medical coverage because the support payments were court ordered and the medical coverage came at no cost to Father. However, every domestic law practitioner is aware of the attempts a payor parent can make to frustrate court ordered support and medical coverage. Furthermore, we are all aware of those parents who are deficient in support and wait to catch up until either a court threatens them with sanctions or a matter arises, such as this stepparent adoption, where the parent about to lose custody suddenly pays all child support arrears to curry favor with the court. In this case, there is no evidence of such behavior on Father's part. All the evidence, and the court's findings, suggest that during the two years before the filing of the petition (and all other times for that matter), Father faithfully provided child support and medical coverage for N.B. without any attempts to frustrate such support. Even though court ordered, as all child support is in Kansas, continually and without controversy providing support and medical coverage to a minor child is the opposite of abandoning or failing to perform parental duties.

During the two years prior to the Petition's filing, Father continuously and with no objection paid child support, he continuously and with no objection provided medical

11

coverage. Throughout the two-year period he had telephonic and video contact with the minor child even if the contacts were short. They were short because the child, who was young, wanted off the phone and not because Father wanted to end the calls. In addition, he made other attempts to contact the daughter, which Mother did not allow, both telephonically and in person. The record indicates Mother probably properly refused those attempts, but the issue here is whether Father abandoned or refused parental duties, not whether he effectively executed those duties as much as he could have. The record indicates Father repeatedly sought information from Mother about N.B.'s schooling, therapy, and medical records. Again, the issue is not whether Father could or should have taken extra steps to get this information. The issue is whether he abandoned or refused his parental duties, and a parent refusing or abandoning parental duties does not call the other parent to get such information.

Could Father have done more to get information about N.B. during the relevant two-year time period? Yes. Could Father have taken more action to guarantee parenting time with N.B. during this time period? Sure. Could one go so far as to say that Father could have done a much better job at being a parent during this two-year period? Of course. Was Stepfather more involved in N.B.'s life than Father during those two years? Yes, perhaps substantially so. Is Stepfather a loving and positive influence in N.B.'s life? Absolutely. But none of those questions are the questions for this court, and they were not the questions for the trial court. Rather, the question we must answer is whether there is substantial and competent evidence that Father abandoned or refused his role as a parent so as to permit Stepfather's adoption of N.B. without Father's consent. The answer to that question is no.

Reversed.

12